COURT OF APPEALS OF VIRGINIA


Present:  Judges Humphreys, Clements and Agee*
Argued at Richmond, Virginia


STEVEN M. GOAD, M.D.
                                              OPINION BY
v.   Record No. 0016-02-2     JUDGE JEAN HARRISON CLEMENTS
                                            MAY 20, 2003
VIRGINIA BOARD OF MEDICINE


          FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                     Randall G. Johnson, Judge

          James J. Knicely (Thomas H. Roberts;
          Knicely & Associates, P.C.; Thomas H. Roberts
          & Associates, P.C., on briefs), for
          appellant.

          Evelyn R. Fleming, Special Assistant Attorney
          General (Jerry W. Kilgore, Attorney General;
          Francis S. Ferguson, Deputy Attorney General;
          Jane D. Hickey, Senior Assistant Attorney
          General and Chief, on brief), for appellee.


     Steven M. Goad, M.D., appeals from an order of the circuit

court affirming an order of the Virginia Board of Medicine

(Board)[1] finding him guilty of unprofessional conduct under

     * Justice Agee participated in the hearing and decision of
this case prior to his investiture as a Justice of the Supreme
Court of Virginia.

     [1] For clarity's sake, we use the term "Board" when referring
in this opinion to the Virginia Board of Medicine acting in this
case in its adjudicative capacity and the term "Commonwealth"
when referring to the Virginia Board of Medicine acting in its
prosecutorial capacity.

former Code §§ 54.1-2914(A)(9) and 54.1-2914(A)(13)[2] and imposing sanctions under Code § 54.1-2915(A)(3).  On appeal, Goad contends the circuit court erred in affirming the Board's order because (1) the evidence presented by the Commonwealth was insufficient to support the conclusion that Goad was guilty of unprofessional conduct under former Code §§ 54.1-2914(A)(9) and 54.1-2914(A)(13), (2) the Board erred in distributing irrelevant and prejudicial materials to the Board members prior to the formal hearing, and (3) the Board erred in its conduct of the formal hearing by "relinquish[ing] control" of the hearing to the Board's counsel and allowing its counsel to be present in the Board's deliberations.[3]  Finding the record lacks substantial evidence to support the Board's determination that Goad was guilty of having engaged in unprofessional conduct under former Code §§ 54.1-2914(A)(9) and 54.1-2914(A)(13), we reverse the judgment of the circuit court and remand the case.[4]

## I.  BACKGROUND

---

[2] Code § 54.1-2914 having been amended, former Code § 54.1-2914(A)(9) is now Code § 54.1-2914(A)(7) and former Code § 54.1-2914(A)(13) is now Code § 54.1-2914(A)(11).

[3] Goad also contends on appeal that the Board's notice of hearing and statement of particulars did not give him sufficient notice of the charges against him.  However, having failed to raise that issue before the Board, he is precluded from raising it on appeal.  See Pence Holdings, Inc. v. Auto Center, Inc., 19 Va. App. 703, 707, 454 S.E.2d 732, 734 (1995) (holding that an appellant may not raise an issue on appeal from a decision of an administrative agency that he did not raise before the agency); Rule 5A:18.

[4] In view of this holding, we do not address the remaining assignments of error.

The relevant facts in this case are undisputed.  Following his 1991 graduation from the University of Virginia School of Medicine, Goad was accepted into a residency program in psychiatry at Virginia Commonwealth University's Medical College of Virginia.  In February 1993, while sharing a call room at the hospital with a third-year medical student, Goad, who was the supervising resident in the psychiatry section of the hospital at the time, asked the medical student if she wanted a backrub.  When the student declined, Goad apologized several times for having asked her.  The student informed her supervisor,        Dr. James Levenson, of the incident, but made it clear she did not want to file a complaint or get Goad "into trouble."  She further indicated that, while the incident made her uncomfortable, there was no coercion or sexual contact involved.  Goad had no input with respect to grading or evaluating the medical student's work.

In response to that incident, Levenson and Dr. John Urbach, the director of residency education at the Medical College of Virginia, met with Goad.  Goad admitted in that meeting that he knew "almost immediately" after asking the medical student about the backrub that he had "crossed a boundary with [the] student," for which he had "tried to apologize."  Cautioning him that such lack of respect for "professional boundaries" might harm his professional reputation, Levenson and Urbach gave Goad a copy of the Virginia Commonwealth University "Sexual Harassment Guidelines"[5] and encouraged him to pursue personal psychotherapy.

_____

[5] As conceded by the Commonwealth at oral argument, neither these nor any other ethical guidelines associated with the Medical College of Virginia were ever introduced into the record.

Goad was subsequently promoted by Urbach and his colleagues to the position of chief resident. In April 1994, Goad was issued a full and unrestricted license to practice medicine in Virginia.

In June 1994, Urbach learned of another female medical student who had complained about Goad's behavior. The student reported that she and Goad, whom she had met at the "V.A. hospital," initially discussed her concerns about trying to decide whether to pursue a career in medicine or surgery. Their ongoing discussions soon shifted to questions about religious and spiritual matters. Goad, who did not supervise the student, informed her that "he was not acting as her psychiatrist or . . . therapist" but was willing to talk with her about her concerns, in meetings he characterized as "spiritual counseling." Goad and the student met several times in the following weeks. At some point, however, the student "suddenly became aware that [Goad] was sexually interested in her." Feeling "vulnerable and upset" over Goad's "betrayal," the student reported Goad's interaction with her to the associate dean for students at the Medical College of Virginia. The student did not allege any sexual involvement with Goad and did not file a formal sexual harassment charge with the Medical College of Virginia.

On July 14, 1994, after meeting with Urbach and Dr. Joel Silverman, the department of psychiatry chairman, Goad was found to have engaged in a "pattern of repeated inappropriate overtures" and was formally suspended from the residency program. It was noted, however, that "no inappropriate behaviors or boundary violations toward patients had been identified."

- 4 -

In August 1994, Goad agreed to participate in a psychological evaluation.  Following that evaluation, his status in the residency program was upgraded to "probationary."  The terms of the probation required that Goad resign his position as chief resident, attend regularly scheduled treatment sessions, and submit to an additional psychological evaluation in the future.  Goad was also warned that "[a]ny further evidence of inappropriate advances toward medical students or other medical center/University personnel [would] be considered a violation of probation and grounds for dismissal."

In the ensuing months, Goad's conduct was "closely monitored."  His "clinical performance," it was noted, "was reportedly very good" at the time.

However, in April 1995, Silverman received information from the director of Snowden Psychiatric Hospital regarding Goad's "inappropriate behavior" toward a staff social worker at that facility during his on-call weekend.  The social worker, who was employed part-time as the admissions counselor at the hospital, reportedly stated that she experienced "considerable emotional distress" when Goad came into her office to speak with her and, during their conversation, "repeatedly made comments of a sexually suggestive nature" while simultaneously acknowledging he would never act on them because "they were both Christians."  The social worker also reported that she "felt embarrassed, angry, and threatened" by Goad's comments and told the director of the hospital that she did not want to be assigned to work when Goad was scheduled to work at the facility.  No sexual involvement was

alleged, and Goad did not supervise the social worker.  The social worker never saw or spoke to Goad again.

Meeting with Silverman and Urbach on May 4, 1995, Goad admitted he had acted inappropriately toward the social worker at the Snowden facility and that he was "sexually excited" during his conversation with her.  He added, however, that he was unaware that his comments had made her feel uncomfortable.  He further indicated at a subsequent hearing that his conversation with the social worker was a philosophical discussion regarding Christianity and Freudian theory and that his sexually suggestive remarks were merely an illustrative example of the "conflict between maintaining fellowship with God . . . and being governed by the desires of the flesh."

On May 18, 1995, having found Goad had violated his probation and engaged in "an ongoing pattern of unprofessional conduct," the department of psychiatry dismissed him from its residency program.  In accordance with procedures set forth by the Medical College of Virginia, Goad appealed the dismissal.

On June 30, 1995, during a department of psychiatry committee hearing convened to consider Goad's appeal, Goad recounted an incident in February 1994 in which he and a female medical student engaged in fondling, while fully unclothed, in a call room during an on-call shift at the Medical College of Virginia.  No other evidence regarding this incident was presented.

Goad's dismissal from the residency program was upheld at each level of review by the Medical College of Virginia.  On February 27, 1996, following the final review by the dean of the

medical school, the department of psychiatry informed the Board of Goad's dismissal from the Medical College of Virginia's residency program.

On October 27, 2000, the Board sent Goad a letter informing him that the Board would hold an informal conference to consider whether, based on allegations that he had engaged in unprofessional conduct under former Code §§ 54.1–2914(A)(9) and 54.1–2914(A)(13), his license should be suspended or revoked under Code § 54.1–2915(A)(3).[6]  The letter alleged, in pertinent part, as follows:

> From approximately February 1993 to June 1994, while a psychiatry resident at the Medical College of Virginia, Richmond, Virginia ("MCV"), you engaged in a recurrent pattern of inappropriate behavior toward female medical students which represented a pattern of sexual harassment under MCV's guidelines, as well as inappropriate use of a supervisory role during clinical on-call time.

The letter went on to describe Goad's allegedly inappropriate interactions with, among others, the social worker and three medical students discussed above.

On January 26, 2001, the Board held an informal conference. Following that conference, the Board, citing the incidents described in the October 27, 2000 letter of notification, found that Goad had engaged in "inappropriate behavior toward female medical students which represented a pattern of sexual harassment

---

[6] While the Board's prosecution of Goad more than four and a half years after receiving notification from the Medical College of Virginia of Goad's alleged unprofessional conduct is not precluded by the doctrine of laches or any statute of limitations, we find the Board's protracted delay in instituting such proceedings troubling.

under MCV's guidelines, as well as inappropriate use of a supervisory role during clinical on-call time."

On March 5, 2001, Goad requested a formal administrative hearing and the Board's order from the informal conference was vacated. On May 4, 2001, the Board sent Goad a letter notifying him that the Board would hold a formal administrative hearing to consider the allegations in the statement of particulars attached to the letter. The attached statement of particulars stated, in pertinent part, as follows:

> The Board alleges that [Goad] may have violated [Code §] 54.1-2915(A)(3), as further defined in [former Code §§ 54.1-2914(A)(9) and 54.1-2914(A)(13)], in that:
>
> 1. From approximately February 1993 to June 1994, while a psychiatry resident at the Medical College of Virginia, Richmond, Virginia ("MCV"), Dr. Goad engaged in inappropriate behavior toward female medical students which represented a pattern of sexual harassment under MCV's guidelines, as well as inappropriate use of a supervisory role during clinical on-call time.

The statement of particulars went on to describe Goad's allegedly inappropriate interactions with the social worker and three medical students discussed above.

On June 7, 2001, the Board held a formal administrative hearing to determine whether Goad should be sanctioned under Code § 54.1-2915(A)(3). As a preliminary matter, the Board permitted the Commonwealth to introduce into evidence, over Goad's objection, copies of Section 3.08 of the American Medical Association's Code of Medical Ethics[7] and Annotation 14 under

---

[7] Section 3.08 of the American Medical Association's Code of Medical Ethics provides:

Section 4 of the American Psychiatric Association's Principles of

Medical Ethics with Annotations Especially Applicable to

Psychiatry.[8]  In response to Goad's claim that the mere admission

---

Sexual harassment may be defined as
sexual advances, requests for sexual favors,
and other verbal or physical conduct of a
sexual nature when (1) such conduct
interferes with an individual's work or
academic performance or creates an
intimidating, hostile, or offensive work or
academic environment or (2) accepting or
rejecting such conduct affects or may be
perceived to affect employment decisions or
academic evaluations concerning the
individual.  Sexual harassment is unethical.
Sexual relationships between medical
supervisors and their medical trainees raise
concerns because of inherent inequalities in
the status and power that medical
supervisors wield in relation to medical
trainees and may adversely affect patient
care.  Sexual relationships between a
medical trainee and a supervisor even when
consensual are not acceptable regardless of
the degree of supervision in any given
situation.  The supervisory role should be
eliminated if the parties involved wish to
pursue their relationship.

[8] Annotation 14 under Section 4 of the American Psychiatric
Association's Principles of Medical Ethics with Annotations
Especially Applicable to Psychiatry provides:

14.  Sexual involvement between a
faculty member or supervisor and a trainee
or student, in those situations in which an
abuse of power can occur, often takes
advantage of inequalities in the working
relationship and may be unethical because
(a) any treatment of a patient being
supervised may be deleteriously affected;
(b) it may damage the trust relationship
between teacher and student; and (c)
teachers are important professional role

of the two documents did not constitute the establishment of a standard of ethics that was binding on Virginia doctors, the presiding member of the Board agreed, saying, "We're just accepting them as exhibits." The assistant attorney general representing the Commonwealth added, "The Commonwealth would assert that the respondent is free to provide any other ethical codes that he believes his conduct is in conformity with and this is merely something for the Board to look to for ethical guidelines and use as a comparison." Goad's attorney responded, "Of course, . . . the burden is not upon Dr. Goad to provide such. It's upon the state to show that he has violated the laws of Virginia as set forth in the [Statement] of Particulars against him."

At the formal administrative hearing, no witness called by the Commonwealth testified about the American Medical Association's Code of Medical Ethics or the American Psychiatric Association's Principles of Medical Ethics with Annotations Especially Applicable to Psychiatry or the two specific sections of those respective sets of ethical guidelines introduced by the Commonwealth. Nor did the Commonwealth present any other evidence regarding those guidelines. Similarly, the Commonwealth introduced no evidence regarding the standards set forth in the Medical College of Virginia's "guidelines" referenced in the statement of particulars or any other evidence regarding the governing ethical standard referenced in former Code § 54.1-2914(A)(9).

_____

models for their trainees and affect their
trainees' professional behavior.

When, later in the hearing, Goad's attorney attempted to ask Urbach if the Medical College of Virginia disciplinary committee that reviewed Goad's conduct was in compliance with Section 9.05 of the American Medical Association's Code of Medical Ethics,[9] the presiding member of the Board disallowed such questioning, ruling that Section 9.05 of the American Medical Association's Code of Medical Ethics "is not a statute" but "a recommendation." Goad then moved to have the previously admitted excerpts from the American Medical Association's Code of Medical Ethics and the American Psychiatric Association's Principles of Medical Ethics with Annotations Especially Applicable to Psychiatry stricken from the record "based on [the Board's] ruling." The Board denied the request. Clarifying his earlier ruling regarding

---

[9] Section 9.05 of the American Medical Association's Code of Medical Ethics provides, in substantial part:

> The basic principles of a fair and objective hearing should always be accorded to the physician or medical student whose professional conduct is being reviewed. The fundamental aspects of a fair hearing are a listing of specific charges, adequate notice of the right of a hearing, the opportunity to be present and to rebut the evidence, and the opportunity to present a defense. These principles apply when the hearing body is a medical society tribunal, medical staff committee, or other similar body composed of peers. The composition of committees sitting in judgment of medical students, residents, or fellows should include a significant number of persons at a similar level of training.
> These principles of fair play apply in all disciplinary hearings and in any other type of hearing in which the reputation, professional status, or livelihood of the

Section 9.05 of the American Medical Association's Code of Medical Ethics, the presiding Board member added:

> The ruling I'm making is the composition of the committee and so forth is a different issue from the medical ethics and other recommendations by the [American Medical Association] and it does not relate to the fundamental ethics of medicine.

Upon conclusion of the Commonwealth's evidence, Goad moved to strike the case, contending, among other things, that the evidence presented by the Commonwealth was insufficient to find him "guilty of professional misconduct as . . . charged in the statement of particulars" because no ethical standard had been established and there was no showing in the cited incidents of any (1) sexual involvement, (2) supervisor-trainee relationship, or (3) harm to the public. The Board, finding that "the evidence demonstrated that Dr. Goad on at least four occasions acted in violation of medical ethics, specifically Section [4]-14 of the Principles of Medical Ethics [with Annotations Especially Applicable to Psychiatry] regarding sexual involvement with a student," denied Goad's motion to strike.

Goad subsequently attempted to introduce into evidence the affidavits of two doctors, one purportedly an "expert in the field of medical ethics" and the other "in the field of medicine." Both doctors stated in their affidavits that the American Medical Association's Code of Medical Ethics was not binding on doctors practicing in Virginia. The assistant attorney general representing the Commonwealth argued that the affidavits were inadmissible because (1) one must "be <u>voir dired</u>

_____

physician or medical student may be

and qualify as an expert before the Board," (2) the legal opinions of a doctor are irrelevant in the case, and (3)

> the ethics presented in this case are not the issue; Dr. Goad's behavior is the issue. The ethics are merely guideline principles that we're basing our action upon. The Board is certainly free to use its own standards and the respondent is free to submit other ethical standards.

The Board refused to admit the affidavits "for the reasons stated by" the assistant attorney general representing the Commonwealth. Goad presented no further evidence.

Following deliberations, the Board found Goad guilty of having engaged in unprofessional conduct in violation of Code § 54.1-2915(A)(3), as further defined in former Code §§ 54.1-2914(A)(9) and 54.1-2914(A)(13). In reaching that decision, the Board recited as findings of fact the incidents described in the statement of particulars and specifically found that Goad had engaged in "inappropriate behavior toward female medical students which represented a pattern of sexual harassment under MCV's guidelines, as well as inappropriate use of a supervisory role during clinical on-call time." The Board's ruling made no mention of the American Medical Association's Code of Medical Ethics or the American Psychiatric Association's Principles of Medical Ethics with Annotations Especially Applicable to Psychiatry.

Based on its findings, the Board ordered that Goad's license to practice medicine and surgery in Virginia "be placed on indefinite probation" until certain specified conditions were met. The Board entered an order reflecting its findings of fact

---

negatively impacted.

- 13 -

and conclusions of law on June 11, 2001.  Like the Board's rulings at the hearing, that order lacked any reference to the American Medical Association's Code of Medical Ethics or the American Psychiatric Association's Principles of Medical Ethics with Annotations Especially Applicable to Psychiatry.

Goad subsequently appealed the Board's decision to the circuit court.  Finding no error of law, the court affirmed the Board's decision.  This appeal followed.

## II.  ANALYSIS

On appeal, Goad contends the evidence presented by the Commonwealth at the formal administrative hearing was insufficient to support the Board's determination that he was guilty of having engaged in unprofessional conduct under former Code §§ 54.1-2914(A)(9) and 54.1-2914(A)(13).  Specifically, he argues the evidence was insufficient to establish either an ethical standard by which his conduct could be adjudicated under former Code § 54.1-2914(A)(9) or a violation of any ethical standard under that statute.  He further argues that the evidence was insufficient to establish that he performed "any act likely to deceive, defraud or harm the public" under former Code § 54.1-2914(A)(13).

Code § 54.1-2915(A)(3) authorizes the Board to suspend or revoke a doctor's license to practice medicine and surgery in Virginia if that doctor engages in "[u]nprofessional conduct." Hearings conducted by the Board to determine whether to revoke or suspend a doctor's license under Code § 54.1-2915(A)(3) are subject to the provisions of the Virginia Administrative Process Act.  See Code § 54.1-2920.

Accordingly, in reviewing a decision of the Board to suspend or revoke a doctor's license pursuant to Code § 54.1-2915(A)(3), we are limited "with respect to issues of fact . . . to ascertaining whether there was substantial evidence in the [Board] record upon which the [Board] as the trier of the facts could reasonably find them to be as it did."  Code § 2.2-4027; see also Virginia Real Estate Comm'n v. Bias, 226 Va. 264, 268-69, 308 S.E.2d 123, 125 (1983).  In Bias, the Supreme Court stated:

> The "substantial evidence" standard, adopted by the General Assembly, is designed to give great stability and finality to the fact-findings of an administrative agency. The phrase "substantial evidence" refers to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938) (emphasis added).  Under this standard, . . . the court may reject the agency's findings of fact "only if, considering the record as a whole, a reasonable mind would necessarily come to a different conclusion."  B. Mezines, Administrative Law § 51.01 (1981) (emphasis in original).

226 Va. at 269, 308 S.E.2d at 125.  "[T]he substantial evidence standard accords great deference to the findings of the administrative agency, but even under this standard the evidence must be relevant to the conclusion reached."  Atkinson v. Virginia Alcohol Beverage Control Comm'n, 1 Va. App. 172, 178, 336 S.E.2d 527, 531 (1985).

Additionally, in accordance with familiar principles of appellate review, "we review the facts in the light most favorable to sustaining the Board's action," id. at 176, 336 S.E.2d at 530, and "take due account of the presumption of

- 15 -

official regularity, the experience and specialized competence of the agency, and the purposes of the basic law under which the agency has acted," Code § 2.2-4027.

In this case, Goad was charged with having engaged in unprofessional conduct under former Code §§ 54.1-2914(A)(9) and 54.1-2914(A)(13).  Former Code § 54.1-2914(A)(9) provides:

> Any practitioner of the healing arts regulated by the Board shall be considered guilty of unprofessional conduct if he:
>
> \*    \*    \*    \*    \*    \*    \*
>
> 9.   Conducts his practice in such a manner contrary to the standards of ethics of his branch of the healing arts[.]

In seeking to have the Board suspend or revoke Goad's license, the Commonwealth had the burden to prove his guilt.[10] See former Code § 9-6.14:12(C) (now Code § 2.2-4020(C)).  Hence, for the Board to find Goad guilty of unprofessional conduct under former Code § 54.1-2914(A)(9), the Commonwealth had to establish three things: first, the applicable "standards of ethics of [Goad's] branch of the healing arts" by which his conduct was to be adjudicated under the statute; second, the specific ethical standard Goad was alleged to have violated; and, third, Goad's violation of that standard.

To that end, the Commonwealth introduced into the record, as exhibits, copies of Section 3.08 of the American Medical

---

[10] As neither party raised before the Board or on appeal the question of what burden of proof should be applied in this case, that issue is not before us.  Because the statutes at issue here are silent regarding the applicable standard of proof, we assume, without deciding, for purposes of this appeal that the evidentiary burden of proof to be applied is a preponderance of the evidence.

- 16 -

Association's Code of Medical Ethics and Annotation 14 under Section 4 of the American Psychiatric Association's Principles of Medical Ethics with Annotations Especially Applicable to Psychiatry.  The Commonwealth concedes on appeal, however, that the Board has promulgated no regulation establishing the American Medical Association's Code of Medical Ethics, the American Psychiatric Association's Principles of Medical Ethics with Annotations Especially Applicable to Psychiatry, or any other set of ethical standards as the applicable "standards of ethics of [Goad's] branch of the healing arts" under former Code § 54.1-2914(A)(9).

Moreover, the Commonwealth presented no evidence or rationale at the hearing demonstrating that the standards it introduced or any other standards were applicable to Goad in this case.  Indeed, to the contrary, upon introducing Section 3.08 of the American Medical Association's Code of Medical Ethics and Annotation 14 under Section 4 of the American Psychiatric Association's Principles of Medical Ethics with Annotations Especially Applicable to Psychiatry, the assistant attorney general representing the Commonwealth insisted that Goad could introduce his own ethical standards and that the ethical standards set forth in the Commonwealth's exhibits were "merely something for the Board to look to for ethical guidelines and use as a comparison."  Later, the assistant attorney general representing the Commonwealth stated:

> [T]he ethics presented in this case are not
> the issue; Dr. Goad's behavior is the issue.
> The ethics are merely guideline principles

that we're basing our action upon. The Board is certainly free to use its own standards and the respondent is free to submit other ethical standards.

For its part, the Board acknowledged, after admitting the two ethical standards presented by the Commonwealth into evidence, that the admission of those exhibits alone was insufficient to establish a standard of ethics by which Goad's conduct could be judged. The Board later appeared to rule, in prohibiting Goad's cross-examination of a witness on a section of the American Medical Association's Code of Medical Ethics unrelated to the instant prosecution, that the American Medical Association's Code of Medical Ethics was merely "a recommendation" and, thus, not binding in the case.

Furthermore, in finding Goad guilty of having engaged in unprofessional conduct under former Code § 54.1-2914(A)(9), the Board made a number of findings of fact regarding Goad's conduct but drew no connection between that conduct and Section 3.08 of the American Medical Association's Code of Medical Ethics or Annotation 14 under Section 4 of the American Psychiatric Association's Principles of Medical Ethics with Annotations Especially Applicable to Psychiatry. Indeed, the Board's only reference in its order to any possible standards of ethics appears in its finding that Goad engaged in "inappropriate behavior toward female medical students which represented a pattern of sexual harassment under [the Medical College of Virginia's] guidelines." Those guidelines, however, are not included in the record. Nor is there anything in the record that describes those standards or even remotely suggests they

- 18 -

constitute a "standard of ethics of [Goad's] branch of the healing arts," as required by former Code § 54.1-2914(A)(9).

Because no evidence was presented establishing the "standards of ethics of [Goad's] branch of the healing arts" by which his conduct was to be adjudicated under former Code § 54.1-2914(A)(9), we find there is not substantial evidence in the record upon which the Board could reasonably find that Goad "conducted his practice in a manner contrary to the standards of ethics of his branch of the healing arts," in violation of former Code § 54.1-2914(A)(9).

The Board also found Goad engaged in unprofessional conduct under former Code § 54.1-2914(A)(13).  Former Code § 54.1-2914(A)(13) provides:

> Any practitioner of the healing arts regulated by the Board shall be considered guilty of unprofessional conduct if he:
>
> *     *     *     *     *     *     *
>
> 13.  Performs any act likely to deceive, defraud or harm the public[.]

There is no evidence in the record that demonstrates, absent reliance on speculation and pure conjecture, that Goad performed any act likely to deceive, defraud, or harm the public.  Indeed, nothing in the record shows that Goad's interactions with the social worker and three medical students interfered with or was likely to interfere with his ability to provide care to his patients.  Likewise, the record is devoid of evidence showing that Goad's conduct interfered with or was likely to interfere with the ability of the social worker and medical students to perform their duties at work or school or otherwise prevent them

- 19 -

from providing suitable care to patients and other members of the public with whom they dealt.  Nor, contrary to the Commonwealth's assertions, did the Board make any such findings.[11]  We find, therefore, that there is not substantial evidence in the record upon which the Board could reasonably find that Goad "[p]erform[ed] any act likely to deceive, defraud or harm the public," in violation of former Code § 54.1-2914(A)(13).

In conclusion, having found there was not substantial evidence in the record to support the Board's findings that Goad was guilty of having engaged in unprofessional conduct under former Code §§ 54.1-2914(A)(9) and 54.1-2914(A)(13), we reverse

_____

[11] The Commonwealth contends in its appellate brief as follows:

> [T]he Board reasonably concluded that Goad's behaviors were harmful to the medical students and his co-worker at the psychiatric hospital.  Further, the Board determined that the behaviors could have resulted in harm to patients due to the disruption of the work routine because the individuals were unwilling to work with Goad following his inappropriate behavior.  Additionally, the Board appropriately found the behaviors occurring in a call room while Goad was on-call for emergency room services could have been harmful to patients who would have had to wait for Goad to refocus his attention from his sexual arousal to his medical work and resume the concentration necessary to provide safe patient care.

Nothing in the record, however, shows that the Board ever reached or made such "conclusions," "determinations," or "findings."  Hence, we find the Commonwealth's inclusion in its brief of the foregoing representations troubling.

the circuit court's judgment affirming the Board's imposition of sanctions against Goad under Code § 54.1-2915(A)(3). Accordingly, we remand this case to the circuit court with instructions to set aside the Board's June 11, 2001 order placing Goad's license to practice medicine and surgery in Virginia "on indefinite probation" and to remand the matter to the Board for such further proceedings as may be requisite, consistent with this opinion.

<u>Reversed and remanded.</u>