UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:   Judges Humphreys, Decker and Russell
Argued at Arlington, Virginia

PANKAJ MERCHIA, M.D.

                                            MEMORANDUM OPINION* BY
v.      Record No. 0308-18-4      JUDGE WESLEY G. RUSSELL, JR.
                                                DECEMBER 4, 2018

VIRGINIA BOARD OF MEDICINE

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Bruce D. White, Judge

Pankaj Merchia, M.D., *pro se*.

Erin L. Barrett, Assistant Attorney General (Mark R. Herring,
Attorney General; Cynthia V. Bailey, Deputy Attorney General;
Allyson K. Tysinger, Senior Assistant Attorney General, on brief),
for appellee.

Appellant Pankaj Merchia, M.D., challenges a circuit court order dismissing his appeal of a

decision of the Virginia Board of Medicine (the Board) reprimanding and disciplining him for his

conduct related to patients' records.  Finding no error, we affirm.

BACKGROUND

On appeal, we view the evidence in the light most favorable to the Board, the party

prevailing below.  Hedleston v. Va. Ret. Sys., 62 Va. App. 592, 594, 751 S.E.2d 1, 2 (2013).

Appellant is a licensed physician certified in sleep medicine.  In 2005, he helped establish a sleep

disorder center known as SleepHeart in Massachusetts; the center closed in 2008.  In 2008, he

assisted a medical school friend and her father with establishing a similar center in Northern

Virginia, also called SleepHeart, and organized under the name SleepHeart of Virginia, LLC.

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

Appellant helped file the center's LLC paperwork and served as its registered agent, but did not have an equity interest in the business. Nonetheless, he did serve as a manager of the business and as the center's "medical director." Although appellant described his work with SleepHeart of Virginia, LLC as "part-time," he testified before the Board that he worked for the business thirty to forty hours a week. In addition to performing consulting and research services for SleepHeart, he provided medical services to patients, including Patients A and C. He identified himself as SleepHeart's "sole clinician who sees patients" and testified that he "reported to [himself]."

Patient A began seeing appellant in March 2009, but in June relocated to Pennsylvania, where she found another doctor. In August 2009, Patient A requested multiple times that appellant send a copy of her records to her or her new doctor. The new doctor also requested the records on Patient A's behalf. When neither Patient A nor her new doctor received the records, Patient A filed a complaint with the Department of Health Professions (DHP) on November 3, 2009. As of the initiation of these proceedings, Patient A still had not received any of her records.

Appellant provided sleep medicine services to Patient C in April and May 2009. Months later, Patient C began a different treatment plan with another practice. To facilitate the transition, Patient C requested his records from SleepHeart in October 2009. On March 1, 2010, Patient C received seven pages of documents reflecting summaries of office visits and resulting treatment, but the records received did not include all of his records from SleepHeart. Patient C filed a complaint with DHP on March 9, 2010.

By letter dated August 18, 2014, DHP informed appellant that the Board was going to conduct an informal conference to "inquire into allegations that [he] may have violated certain laws and regulations governing the practice of medicine and surgery in Virginia." The allegations included the complaints by Patients A and C regarding their requests for medical records and a charge that appellant had engaged in fraudulent billing practices. The informal conference was

scheduled for November 12, 2014, and the letter informed appellant that he could be represented by counsel.

Appellant requested more time to review documentation provided by the Board, and the informal conference was continued to January 14, 2015. Appellant appeared with counsel. On February 25, 2015, the Board issued appellant a reprimand based on its finding that appellant failed to comply with requirements regarding medical records. By letter dated April 6, 2015, appellant, by counsel, requested that the Board vacate its order; appellant contended that, as a result of a June 11, 2013 e-mail he sent to a representative of DHP, the issues already had been decided in his favor by operation of Code § 2.2-4021 and that the January conference failed to "compl[y] with certain procedural and substantive requirements" with relation to some of the allegations, rendering it void. In the alternative, appellant requested a formal administrative hearing.

By letter dated April 14, 2015, the Board advised appellant that it had received his "request for a formal hearing," that the matter would be scheduled in the future with thirty-days' notice, and that the February 25, 2015 order had been vacated. On May 14, 2015, the Board issued a notice of a formal administrative hearing for June 18, 2015. The Board provided a "Statement of Particulars" on May 15, 2015. By letter dated May 19, 2015, appellant requested that the matter "be continued" to allow for adequate preparation and resolution of another pending matter. Throughout 2016, the Board, at the request of appellant, issued numerous subpoenas to third parties. Some of those parties challenged the subpoenas, causing additional delays.

The formal hearing was rescheduled for January 27, 2017, but on November 28, 2016, appellant requested another continuance to allow for responses to some of the subpoenas that had been issued at his request. Appellant's motion for a continuance was granted on December 2, 2016. Although appellant had requested that the matter not be heard prior to June 1, 2017, on March 8, 2017, the Board sent a notice informing appellant that the hearing had been set for May 19, 2017.

- 3 -

After receiving the notice on March 9, appellant, by letter dated April 5, 2017, requested that the hearing be postponed to November 19, 2017. As grounds, appellant cited the Board's "failure to provide reasonable notice" of pre-hearing objection and motion deadlines, insufficient time to obtain new counsel, and insufficient time to react to the subpoena rulings. The Commonwealth objected to this request for yet another continuance. The Board denied the requested continuance.

On April 10, 2017, appellant filed multiple pre-hearing motions and asked for a stay of proceedings pending their resolution. Appellant also objected to numerous Commonwealth exhibits, claiming they constituted hearsay, lacked foundation or relevance, or were unfairly prejudicial. Appellant further objected to additional evidence on timeliness and other grounds. Appellant's pre-hearing motions were denied, and his evidentiary objections were overruled.

The Board conducted the formal hearing on May 19, 2017. Appellant was represented by counsel.[1] Both Patients A and C testified by phone without objection. All witnesses were subject to cross-examination by appellant's counsel. During the Commonwealth's first witness' testimony, appellant attempted to ask the witness a question after his counsel already had done so; the Commonwealth objected and the Board explained to appellant, "you'll be able to speak later as a witness, but with cross-examination, that comes from your counsel." Appellant queried, "I cannot be co-counsel along with my counsel of record for cross-examination purposes?" The Board answered, "No." Over appellant's objections, the Board admitted into evidence Commonwealth exhibits 1 through 9, which included investigation reports prepared by DHP's enforcement division relating to the patients' complaints, correspondence between the patients and appellant,

---

[1] Throughout the proceedings, appellant has been represented by multiple attorneys and has, at times, represented himself. At the formal hearing, the attorney who had been representing him prior to the hearing did not appear; rather, a new attorney made his first appearance at the hearing. Appellant confirmed at the hearing that the new attorney was there to represent him.

correspondence between DHP and appellant, medical and billing/insurance records, and records of the State Corporation Commission.

Patient A testified that prior to her first appointment with her new doctor in Pennsylvania, she contacted appellant to request her records. She stated: "Dr. Merchia said he could do that and then after several phone calls and e-mails by myself and the new doctor's office, those records were never sent." Patient A estimated she made eight attempts to obtain the records. Having established e-mail as a preferred method of communication, she "figured an e-mail request was fine," and she testified that when she asked appellant to send her new doctor the records, "[h]e said, 'yes, that's no problem, I can send them.'" When neither she nor her doctor received them, and she asked again, appellant replied that the delay was due to his son being in the hospital. Patient A stated that that response "was different from what his receptionist said on the phone." When she complained, appellant responded that he had thirty days in which to retrieve her records, and then acknowledged he had fifteen. Patient A testified that, as of the hearing, she still had not received any records.

Exhibits introduced by the Commonwealth corroborated Patient A's testimony. Patient A first requested her records via e-mail on the morning of August 17, 2009. When she followed-up later that afternoon, appellant responded, "got it and will have it done." Patient A sent another e-mail ten days later, on August 27, 2009, stating "I'm quite confused as to why my records have no[t] been sent . . . ." In the e-mail, she referenced other contact she and her doctor made seeking the records. Appellant responded the same morning that he had been ill and that his son had been hospitalized, but that he would "get things straightened out and sent to your doc." Later the same day, Patient A notified appellant that she would be filing a complaint with DHP. In response, appellant acknowledged the request made on August 17, but told appellant, for the first time, that she would need to "mail us a signed letter requesting a copy of your health records . . . ." After initially stating that the records would then be sent within thirty days, appellant told her that she

would receive them within "[fifteen] days of written request." After unsuccessfully attempting to fax appellant her signed "formal records request," Patient A e-mailed a copy of her letter requesting the release of her records on September 11, 2009. The exhibits also proved that Patient A's Pennsylvania doctor requested her records by a letter dated August 31, 2009. That letter referenced that the doctor had made previous requests.

Patient C testified that in October 2009 he submitted a records request through a form on SleepHeart's website. When he did not get a response, he faxed and mailed the request. Patient C stated that he "finally sent a registered mail with the same form to get my records[, and m]y family doctor had tried to get my records and didn't get a response." There also "was some e-mailing back and forth." Patient C explained that eventually, in early March 2010, "[t]hey gave me some of my records, but it wasn't all of the doctor's visits, it wasn't the sleep charts and things like that, so I couldn't get a second opinion." After another e-mail, "[t]hey finally gave me what they told me were all of my records right before I ended up having surgery for deviated septum."

The request form Patient C submitted to SleepHeart was admitted into evidence and shows that Patient C requested "all sleep studies and records pertaining to sleep studies" on October 15, 2009. An e-mail shows that on March 2, 2010, Patient C followed up, notifying SleepHeart that what he had received was incomplete and requesting that "ALL my records be sent." As part of DHP's investigation, appellant eventually produced far more than the seven pages of records in response to DHP's request for Patient C's medical records.

Testifying on his own behalf, appellant acknowledged receiving Patient A's initial e-mail request, but denied ever having received the September 11, 2009 e-mail with her signed letter attached. He also stated Patient C did not make a request covering all the records that subsequently were sent to DHP in its investigation in light of different types of records maintained by SleepHeart.

He also contended that he was not responsible for the administrative functions of the practice such as records management.

Based on the evidence presented at the formal hearing, the Board, in an order dated May 26, 2017, found that appellant "deceived Patient A between August 17, 2009 and August 27, 2009 in his verbal and electronic responses to her requests . . . for copies of her medical records" and that he "failed to provide patient records requested in a timely manner, as required by Section 32.1-127.1:03(E) of the Code." The Board also found that appellant "provided incomplete medical records to Patient C several months after Patient C submitted a request for his records, as required by Section 32.1-127.1:03(E) of the Code." The Board acknowledged that appellant "testified that he believed that he did not have control over the patient records of his practice[, and] . . . that his father, an employee of the practice, was the only person who controlled the records." From this, the Board concluded that appellant "did not have a full understanding of a practitioner's responsibility for the maintenance and release of medical records."

Based on these findings, the Board concluded that appellant had violated Code § 54.1-2915(A)(16),[2] Code § 54.1-2915(A)(18),[3] and 18 VAC 85-20-26(B).[4] The Board issued a formal reprimand and, as a sanction, ordered appellant to complete twelve hours of approved continuing medical education in medical record keeping within a specified time period.

---

[2] Code § 54.1-2915(A)(16) defines as unprofessional conduct a physician "[p]erforming any act likely to deceive, defraud, or harm the public . . . ."

[3] Code § 54.1-2915(A)(18) defines as unprofessional conduct a physician "[v]iolating or cooperating with others in violating any of the provisions of Chapters 1 (§ 54.1-100 et seq.), 24 (§ 54.1-2400 et seq.) and this chapter or regulations of the Board . . . ."

[4] 18 VAC 85-20-26(B) requires a physician to "provide patient records to another practitioner or to the patient or his personal representative in a timely manner in accordance with provisions of § 32.1-127.1:03 of the Code of Virginia."

Appellant appealed the Board's May 26, 2017 order to the circuit court. Appellant alleged that the Board erred in its factual findings, misapplied the law in deeming him responsible for responding to records requests, erroneously admitted evidence, and failed to comply with statutory and constitutional procedural requirements. The parties submitted memoranda, and a hearing was conducted on December 8, 2017.

By order dated December 8, 2017, the circuit court found that "there was no error of law committed by the [Board]" and that the "proceedings under the Virginia Administrative Process Act . . . did not violate [appellant]'s constitutional rights." The circuit court held that "[t]he Board acted within its statutory jurisdiction in disciplining" appellant and had "observed all required procedure." Finding that the Board's decision "was supported by substantial evidence in the record . . .[,]" the circuit court affirmed the judgment of the Board.

Appellant timely noted an appeal to this Court. He contends that: (1) "[t]he evidence does not support the Board's findings of facts"; (2) the Board denied him due process by failing to comply with certain constitutional and statutory requirements; (3) "it is both unlawful and unreasonable for the Board to hold [him] liable for responding to requests for records to the practice"; and (4) "the Board admitted evidence that lacked relevance or basis or foundation or authenticity and prejudiced the Board members."

## ANALYSIS

The Board of Medicine is an administrative agency authorized to discipline a doctor for "unprofessional conduct." Code § 54.1-2915(A). Board disciplinary proceedings "are subject to the provisions of the Virginia Administrative Process Act [(VAPA)]." Goad v. Va. Bd. of Med., 40 Va. App. 621, 633, 580 S.E.2d 494, 500 (2003) (citing Code § 54.1-2920). Under the VAPA, an appealing party bears the "burden of demonstrat[ing] an error . . . subject to review." Code § 2.2-4027. Such errors

include: (i) accordance with constitutional right, power, privilege, or immunity, (ii) compliance with statutory authority, jurisdiction limitations, or right as provided in the basic laws as to subject matter, the stated objectives for which regulations may be made, and the factual showing respecting violations or entitlement in connection with case decisions, (iii) observance of required procedure where any failure therein is not mere harmless error, and (iv) the substantiality of the evidentiary support for findings of fact.

Id.

## I. Substantial evidence supported the Board's findings[5]

Appellant argues that the Board's factual determinations were not supported by the evidence. In reviewing an agency decision, we give deference to an administrative agency's factual determinations, and review them only to ascertain whether they are supported by substantial evidence. Code § 2.2-4027. "'The "substantial evidence" standard . . . is designed to give great stability and finality to the fact-findings of an administrative agency. The phrase "substantial evidence" refers to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."'" Hedleston, 62 Va. App. at 597, 751 S.E.2d at 3 (ellipsis in original) (quoting Va. Real Estate Comm'n v. Bias, 226 Va. 264, 269, 308 S.E.2d 123, 125 (1983)). Accordingly, we review the evidence "in the light most favorable to sustaining the agency's decision," Va. Ret. Sys. v. Blair, 64 Va. App. 756, 770, 772 S.E.2d 26, 32 (2015); and "we may 'reject [the] agency's factual findings only if, considering the record as a whole, a reasonable mind would *necessarily* come to a different conclusion,'" Va. Bd. of Med. v. Hagmann, 67 Va. App. 488, 500, 797 S.E.2d 422, 428 (2017) (alteration and emphasis in original) (quoting Blair, 64 Va. App. at 765, 772 S.E.2d at 30). "Credibility determinations are factual findings subject to this same standard." Id.

---

[5] At oral argument in this Court, appellant made clear that he is not arguing that the acts and omissions alleged by the Board do not constitute violations of the relevant statutes and regulations. Rather, he argues that he did not commit those acts or omissions.

In the proceedings before the Board, there was substantial evidence to support the Board's findings. Specifically, both Patients A and C testified that they requested that appellant provide them their records. Requests were communicated by conversation, e-mail, through the practice's website, fax, and even registered mail. Although appellant contends he was aware only of some of these requests, the record was sufficient to allow a reasonable factfinder to conclude that he was aware of all of them. After all, he does not dispute that he received some of them, and, from the evidence, all of them went to the practice where appellant testified that he was the "sole clinician who sees patients."[6]

Similarly, evidence supports the finding that the records were not produced to the patients in the time frame required by Code § 32.1-127.1:03. Patient A began requesting her records in 2009 and testified that she had not been provided with the records as of the 2017 hearing. Similarly, Patient C testified that he requested records in October 2009 and did not receive any records until March 2010. At that time, despite requests for all of his records, he received seven pages of records. DHP's investigation revealed that there were over fifty pages of responsive records.[7] Accordingly, substantial evidence supported the Board's conclusion that appellant failed to produce the records in the manner required by Code § 32.1-127.1:03.

Evidence also supports the Board's conclusion that appellant made deceptive statements. Patient A detailed numerous communications with appellant in which he conveyed that he was

---

[6] Appellant argues that evidence was introduced that would support a conclusion that he was not the only healthcare provider who worked at the practice. While there may be such evidence, it was not error for the Board to accept appellant's sworn testimony that he was the sole clinician providing patient care, which, when credited by the Board as factfinder, constitutes substantial evidence.

[7] Appellant argues that one of Patient C's requests only sought records related to sleep studies and that the seven pages he was provided were all of the records related to sleep studies. This ignores evidence detailed above that Patient C, on more than one occasion, requested all of his records.

on top of her records request and that she could expect to receive the records soon. Given that Patient A never received the records and the differing reasons appellant gave over time for the lack of production, the Board, sitting as factfinder, was free to conclude that appellant's explanations were untrue and designed to deceive the patient about the status of her records request. In short, there was substantial evidence to support the Board's conclusion that appellant violated Code § 54.1-2915(A)(16), Code § 54.1-2915(A)(18), and 18 VAC 85-20-26(B).

Appellant argues that other evidence in the record supports a contrary conclusion. He points to other evidence, such as portions of his own testimony, that calls into question his knowledge of the requests for records, whether they were properly made, and whether others at the practice were responsible for responding to the requests. In doing so, he misunderstands the role of the Board as factfinder and our role on appeal.

The existence of conflicting evidence is of no moment on appeal. "It is not unusual for there to be conflicting evidence in contested cases, and it is the job of the [Board], as factfinder, to resolve those conflicts." Blair, 64 Va. App. at 769, 772 S.E.2d at 32. That appellant can point to "[t]he existence of evidence in the record supporting a contrary conclusion does not establish that there is not substantial evidence in the record to support [the Board's] determination." Id. Because there is evidence in the record that supports the Board's conclusion, we cannot say the Board erred in concluding that appellant violated the relevant statutes and regulation in the manner described.

II. Due process claims

Appellant next contends that the Board erred in failing to afford him procedural protections grounded in specified constitutional and statutory provisions. Appellant's challenges based on constitutional and statutory provisions raise questions of law subject to *de novo* review.

- 11 -

See Va. Bd. of Med. v. Zackrison, 67 Va. App. 461, 475, 796 S.E.2d 866, 872-73 (2017); Code § 2.2-4027.

A.  Constitutional due process and administrative hearings

"Because a physician may not practice medicine in Virginia without a license, a license to practice medicine is a significant property interest," and thus, is entitled to due process protections.  Zackrison, 67 Va. App. at 482, 796 S.E.2d at 876 (internal citations omitted). Citing the United States Supreme Court, our Supreme Court has recognized "the minimum requirements of constitutional due process which must attend administrative hearings:  timely and adequate notice, the right to confront adverse witnesses and present one's own evidence, the right to the assistance of retained counsel, and an impartial decision-maker."  Hladys v. Commonwealth, 235 Va. 145, 147, 366 S.E.2d 98, 99 (1988) (citing Goldberg v. Kelly, 397 U.S. 254, 271 (1970)).

1.  Notice

Here, the record is clear that appellant received notice of the allegations against him and was given more than adequate time to prepare having been granted multiple continuances to allow for such preparation.  Accordingly, his due process right to timely and adequate notice was satisfied.

2.  Confrontation of adverse witnesses

Appellant, through his chosen counsel, was given the opportunity to cross-examine all of the witnesses against him, and therefore, his due process right to confront adverse witnesses was satisfied.  Appellant makes much of the fact that he was not allowed to ask questions of the witnesses in addition to the questions that his chosen counsel asked.  This is not a denial of confrontation; rather, it is simply a recognition of the longstanding practice in administrative and judicial proceedings that a party may not have multiple attorneys or other representatives

- 12 -

conduct questioning of a single witness. In any event, the record does not demonstrate that any questions that appellant wished to ask any witness were not or could not have been asked by his chosen counsel. Accordingly, his right to confront adverse witnesses was satisfied.[8]

### 3. Right to present evidence

Similarly, appellant's right to present evidence was satisfied. In fact, appellant has pointed to no specific piece of evidence that he sought to introduce that impermissibly was rejected by the tribunal.

### 4. Assistance of counsel

Appellant was represented by counsel in the proceeding before the Board that gives rise to this appeal. Despite previously having represented himself and having been represented by different retained counsel earlier in the proceedings, appellant came to the hearing with counsel of his choosing. Because the new counsel previously had not made an appearance in the case, the Board had appellant confirm that the new counsel who appeared at the hearing was his counsel and allowed that lawyer to represent appellant at the hearing. Given that he was represented at the hearing by counsel he chose, appellant's due process right to the assistance of counsel was satisfied.

---

[8] Appellant also argues that he was deprived of the right of confrontation because the witnesses appeared by telephone. We note, however, that no objection to Patient A and Patient C testifying by telephone was made at the time their testimony was given and that appellant's counsel questioned each of them at that time. Furthermore, absent some issue not apparent from the record before us, a witness appearing by telephone in an administrative hearing does not violate due process.

5. Impartial decision maker

For the first time on appeal, appellant asserts that he was "denied his right to an 'impartial jury[.]'"[9] Specifically, without any support in the record, he baldly asserts that the chairman of the Board proceeding giving rise to this appeal "derives profits from [a medical practice,] which includes a competing sleep medicine practice in the same specialty and in the same geography as where [appellant] practices." The record is devoid of anything that substantiates the allegation, which appellant himself couches by noting he makes it based only "upon information and belief." Appellant points to no evidence of bias during the proceedings. This is significant in that, although the Board found against appellant regarding record keeping issues, it did not make an adverse finding against him regarding the more serious fraud charges. Given the state of the record and the presumption that, serving as a public official, the chairman "acted correctly," Hladys, 235 Va. at 148, 366 S.E.2d at 100, appellant simply has not

---

[9] The failure of appellant to raise the claim below is significant because it prevented the Board from addressing the claim in the manner prescribed by statute. As we observed in Hagmann,

> [p]ursuant to Code § 54.1-110(B), a Board member "shall disqualify himself from a proceeding and withdraw from any case in which he cannot accord fair and impartial consideration." The statute further provides that any party may request disqualification "by stating with particularity the grounds upon which it is claimed that fair and impartial consideration cannot be accorded." Code § 54.1-110(B). Finally, based on those allegations, "[t]he remaining members of the . . . panel shall determine whether the individual should be disqualified." Code § 54.1-110(B). The burden of proving such bias or prejudice lies with the party seeking recusal. On appellate review of such a determination, state administrators are assumed to be [people] of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances absent proof to the contrary.

67 Va. App. at 515-16, 797 S.E.2d at 435 (some internal quotation marks and citations omitted).

- 14 -

demonstrated any bias on the part of the chairman. Accordingly, his due process challenge regarding bias fails.

B. Protections afforded criminal defendants

Equating the notice he received from the Board as an "indictment," the informal fact-finding conference as a "1st trial," and the Board hearing as a "2nd trial," appellant argues that he was entitled to a full range of constitutional protections that are afforded criminal defendants. He reasons that, because the fraudulent billing allegations against him are not only professional misconduct but also serious crimes, he was entitled to have: the Board prove "its charges to the level of beyond a reasonable doubt"; a "unanimous jury" make any adverse finding;[10] and the full panoply of protections afforded criminal defendants by the Fifth and Sixth Amendments to the United States Constitution, including but not limited to protections against double jeopardy.[11]

The flaws in this argument are readily apparent: Board of Medicine proceedings conducted pursuant to the VAPA are not criminal prosecutions; they are administrative proceedings, and thus, do not afford a physician the same rights as a criminal defendant. See, e.g., Hagmann, 67 Va. App. at 503, 797 S.E.2d at 429. The Board's initial notice was not an indictment, the informal fact-finding conference was not a "1st trial," and the ultimate proceeding before the Board was not a criminal trial, first, second, or otherwise. The penalties available to the Board, such as the additional continuing medical education requirement imposed

---

[10] We note that, by statute, the Board is authorized to impose discipline for violations on less than a unanimous vote. Code § 54.1-105.

[11] Appellant is correct that the fraudulent billing practices the Board alleged he engaged in constitute both professional misconduct subject to sanctions by the Board and criminal offenses that could be prosecuted by the appropriate authorities. The fact that the same conduct can subject a person to both criminal sanction and professional discipline does not convert a disciplinary proceeding before the Board into a criminal prosecution.

- 15 -

here, are civil in nature, and the Board did not and does not have the power to impose criminal sanctions. Because Board proceedings are not, in fact, criminal, protections afforded a criminal defendant simply are not applicable to appellant. Accordingly, the Board did not violate appellant's rights by not affording him the same rights afforded a criminal defendant.

C. Statutory due process

Appellant next claims that the Board violated his statutory rights by failing to render its decision consistent with certain procedural deadlines. We disagree.

1. Code § 2.2-4021

Appellant contends that he was entitled to a resolution of all issues in his favor because he alleges that the informal fact-finding conference did not render a decision within the time frame specified in Code § 2.2-4021. On appeal, appellant cites Code § 2.2-4021(C), which provides, in pertinent part, that

> [i]n any informal fact-finding . . . proceeding in which a hearing officer is empowered to recommend a finding, the board, commission, or agency personnel responsible for rendering a decision shall render that decision within 30 days from the date that the agency receives the hearing officer's recommendation. If the agency does not render a decision within 30 days, the named party to the case decision may provide written notice to the agency that a decision is due. If no decision is made within 30 days from agency receipt of the notice, the decision is deemed to be in favor of the named party.[12]

The Board argues that this argument cannot be considered because any actions of the informal fact-finding conference became a nullity once appellant appealed its decision to the Board for a formal hearing. See Code § 54.1-2400(10).

_____

[12] Code § 2.2-4021(B) provides for a similar process for informal fact-finding conferences "in which a hearing officer is not used or is not empowered to recommend a finding[.]" Although he consistently has referenced Code § 2.2-4021, appellant has been inconsistent in his arguments as to whether subsection (B) or (C) applies. Because his opening brief does not reference subsection (B), we limit our analysis to subsection (C).

- 16 -

Assuming without deciding that the argument is properly before us and that the code section is even applicable, we find that it did not preclude the actions of the Board for multiple reasons.[13]

First, in asserting his claims, he has misidentified the initial interviews with him regarding the respective patient complaints as the "informal fact-finding . . . proceeding[s]" and "the hearing officer's recommendation[s]" that trigger the statutory deadlines in Code § 2.2-4021(C). They were not. Initial interviews by investigators are just that—interviews. They do not trigger the statutory deadlines of Code § 2.2-4021(C).[14]

Even if the initial interviews cited by appellant could be construed as informal fact-finding conferences, the deeming provision of Code § 2.2-4021(C) still was not implicated. Under the statute, for "the decision [to be] deemed to be in favor of the named party," two conditions must be met. Id. First, the agency must fail to issue a decision within thirty days of receiving the recommendation of the hearing officer. Second, the named party must "provide written notice to the agency that a decision is due . . . ." Id. Only if the agency fails to issue a decision within thirty days of receiving such written notice will the case decision be "deemed to be in favor of the named party." Id.

Here, in support of his claim that he provided such written notice, appellant cites only to a June 11, 2013 e-mail he sent to an employee of DHP. The "re" line of the e-mail reads: "documents I have provided you in the past and your reports[.]" With the exception of

---

[13] In declining to address these other arguments that could result in affirmance of the Board's decision, we are not commenting on their viability. Rather, we are limiting our discussion of appellant's claim to what we conclude is the best and narrowest ground. See Commonwealth v. Swann, 290 Va. 194, 196, 776 S.E.2d 265, 267 (2015) ("The doctrine of judicial restraint dictates that we decide cases on the best and narrowest grounds available." (internal quotation marks and citation omitted)).

[14] The record reflects that the informal fact-finding conference regarding these complaints occurred in January 2015 and a decision was rendered in February 2015.

appellant's name at the conclusion of the e-mail, the entire body of the e-mail reads as follows: "Thank you for your detailed message. As [sic] the board come to a decision? Thank you[.]" Nothing in the e-mail message even suggests "to the agency that a decision is due" as required to trigger the deeming provision of Code § 2.2-4021(C). The failure of the only writing cited by appellant to provide such notice precludes any possibility that he might have been entitled to relief under Code § 2.2-4021(C).

### 2. Code § 54.1-2400(10)

Appellant contends that the proceedings below were invalid because of the passage of time between the initial complaints by the patients and when the case was actually adjudicated. Specifically, he argues that Code § 54.1-2400(10) required the Board to act "upon receipt of information that a practitioner or permit holder of the appropriate board may be subject to disciplinary action." From this, he contends that the Board immediately has to proceed to an informal fact-finding conference when a complaint is received, and thus, the delay between the receipt of the initial complaints and the prosecution of his case renders the findings invalid.

This misunderstands the statute. Code § 54.1-2400, including subpart (10), is a statutory listing of the powers of health regulatory boards. The provision in question authorizes the Board to conduct informal fact-finding conferences "upon receipt of information that a practitioner or permit holder of the appropriate board may be subject to disciplinary action." It does not set a deadline for the Board to do so and does not require, as appellant's argument necessarily implies, the Board to convene an informal fact-finding conference based solely on a patient complaint without first investigating the claim to determine whether it may have merit. In short, appellant attempts to find a procedural right in a provision that does not create one. Accordingly, the Board did not err in the manner asserted by appellant.

III.  Appellant's responsibility for patient records

Appellant argues that the Board erred in finding him responsible for "responding to requests for records to the practice."  He argues that the records belonged to the practice, that the requests for records were made of the practice, and that he was a mere contract worker at the practice with no ability to produce the requested records.  From these assertions, he contends that he did not have the responsibility to produce the records even if some of the requests were made directly of him.

At the outset, we note that, as a physician licensed by the Board, appellant has a statutory responsibility to provide medical records to his patients who request them.  Medical record production generally is governed by Code § 32.1-127.1:03(A), which is sometimes referred to as the Health Records Privacy Act.  Code § 32.1-127.1:03(A)(1) provides that "[h]ealth care entities shall disclose health records to the individual who is the subject of the health record . . . ."  In turn, Code § 32.1-127.1:03(B) defines "health care entity" as, among other things, "any health care provider," and then adopts the definition of "health care provider" found in Code § 8.01-581.1, which includes "a person . . . licensed by this Commonwealth to provide health care or professional services as a physician . . . ."  Because there is no dispute that appellant was a physician licensed by the Commonwealth, he was subject to the Health Records Privacy Act, including the statutory duty to provide records to his patients who request them.  Code § 32.1-127.1:03(A)(1).

Given this statutory duty, appellant's argument amounts to little more than an impossibility defense—the records belonged to the practice and he, as a mere "contract physician," had no ability

- 19 -

to provide the records to the patients. Even assuming that there may be instances where such a defense may be viable,[15] the Board was not required to accept it here.

Although at times he described himself as a "contract physician," ample evidence before the Board supports the conclusion that this understates his role in the practice. He was central to the formation of the practice, had a role in the filing of the corporate documents bringing it into existence, and served as its registered agent. He was the practice's manager and "medical director." More importantly, he testified under oath before the Board that, in the relevant time period, he was the "sole clinician who [saw] patients" and "reported to [himself]." From all of this, the Board, as factfinder, could reasonably conclude that appellant had both the duty and the ability to produce the requested records.

Such a conclusion is buttressed by appellant's communications with Patient A about her records. When she first contacted appellant about sending her records to her new doctor in Pennsylvania, appellant responded that he could do that. When the records were not forthcoming, Patient A again asked for the records to be sent. Appellant responded "no problem, I can send them." These responses, coupled with the other evidence, supports the Board's conclusion that appellant had the ability to produce the requested records. Accordingly, the Board did not err in concluding that appellant was responsible for doing so and that his failure constituted sanctionable conduct.

IV. Admission of evidence

Appellant contends the Board erred in "admit[ting] evidence that lacked relevance or basis or foundation or authenticity and prejudiced the Board members . . . ." Specifically, he contends

---

[15] It should go without saying that a physician may not structure his practice to insulate himself from his statutory duty to produce medical records when requested.

that the admission of documents related to the Board's allegations that he committed billing fraud prejudiced the Board's consideration of the other issues.

We review appellant's challenge to the Board's admission of evidence under the deferential abuse of discretion standard. See LifeCare Med. Transps., Inc. v. Va. Dep't of Med. Assistance Servs., 63 Va. App. 538, 553, 759 S.E.2d 35, 43 (2014) ("Evidentiary rulings at an administrative agency formal hearing, therefore, are within the discretion of the presiding officer."). Furthermore, we note that proceedings before the Board "are not governed by . . . the rules of evidence" and that "normal rules regarding the admissibility of the evidence are relaxed[.]" Zackrison, 67 Va. App. at 479, 796 S.E.2d at 875. As the Supreme Court has noted,

> [t]he rules of evidence are considerably relaxed in administrative proceedings, and the findings of administrative agencies will not be reversed solely because evidence was received which would have been inadmissible in court. No reversible error will be found in such cases unless there is a clear showing of prejudice arising from the admission of such evidence, or unless it is plain that the agency's conclusions were determined by the improper evidence, and that a contrary result would have been reached in its absence.

Bias, 226 Va. at 270, 308 S.E.2d at 126.

Here, the challenged evidence was certainly relevant. Although the Board ultimately did not sanction appellant for his alleged fraudulent billing, that was an allegation that was before the Board. Because the issue of fraudulent billing was part of the proceeding, evidence related to fraudulent billing was relevant. Even if the fraudulent evidence was such that it "would have been inadmissible in court[,]" appellant has failed to show that the Board's "conclusions [regarding appellant's failures regarding patient records] were determined by the [evidence regarding fraudulent billing], and that a contrary result would have been reached in its absence." Id. Accordingly, the Board did not commit reversible error in its admission of the fraudulent billing evidence.

CONCLUSION

A party seeking to reverse an agency decision under the VAPA must "designate and demonstrate an error of law" that has been committed by the agency. Code § 2.2-4027. We have reviewed the entire record and conclude that appellant has not demonstrated that the Board committed such an error in this case. Accordingly, the judgment below is affirmed.

<u>Affirmed.</u>